INDUSSA CORPORATION, Appellant,

v.

S.S. RANBORG, her engines, boilers, etc. (Erling Hansens Rederi A/S and Skibs A/S Linea, Claimants), Appellee.

No. 332, Docket 30986.

United States Court of Appeals Second Circuit.

Argued Feb. 21, 1967.

Decided April 25, 1967.

William R. Vincent, New York City (Charles D. Herak, New York City, of counsel), for appellant.

John J. Nolan, New York City, William A. Wilson, New York City, for appellee.

Before LUMBARD, Chief Judge, and WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from orders of the District Court for the Southern District of New York declining jurisdiction in favor of the courts of Norway in a United States consignee's *in rem* libel against a Norwegian ship raises questions of the applicability and the soundness of this court's decision in William H. Muller & Co. v. Swedish American Line, Ltd., 224 F.2d 806 (2 Cir.), cert. denied, 350 U.S. 903, 76 S.Ct. 182, 100 L.Ed. 793 (1955). The panel that initially heard the appeal, consisting of Circuit Judges Anderson, Feinberg and the writer, concluded that *Muller,* on which the District Court based its rulings, was wrongly decided and should be overruled. We, therefore, asked our colleagues to consider the appeal *in banc* on the briefs of the parties, they so voted, and this opinion represents the views of the full court.

Indussa Corporation, a New York corporation, was the consignee of nails and barbed wire shipped by a Belgian agency from Antwerp, Belgium, to San Francisco, California, in May 1963. The bills of lading for shipment "on board the good vessel called the 'Ranborg'" were signed by the master and were captioned:

LINEAS NAVIERAS DE CENTRO AMERICA, S. A.

GLOBAL STEAMSHIP AGENCY, INC.

SUITE 416

408 SOUTH SPRING STREET

LOS ANGELES 13, CALIFORNIA

A "Paramount Clause" declared the applicability of "the Hague Rules contained

in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924, as enacted in the country of shipment," but a "U. S. Trade" clause stated:

"C. U. S. Trade. Period of Responsibility.

In case the Contract evidenced by this Bill of Lading is subject to the U. S. Carriage of Goods by Sea Act then the provisions stated in said ·Act shall govern before loading and after discharge and throughout the entire time the goods are in the Carrier's custody."

A still further clause entitled "Jurisdiction" recited:

"Any dispute arising under this Bill of Lading shall be decided in the country where the Carrier has his principal place of business, and the law of such country shall apply except as provided elsewhere herein."

Finally it was provided that "the contract evidenced by this Bill of Lading is between the Merchant and the Owner of the vessel named herein (or substitute)."

Indussa, having located The Ranborg in American waters, brought a libel *in rem* in the District Court for the Southern District of New York in March 1965, alleging that the shipment had arrived in San Francisco damaged, primarily by rust, to the extent of $2600. The usual letter of undertaking and agreement to appear were accepted in lieu of arresting the vessel.

In April 1966 the owners of The Ranborg moved for an order declining jurisdiction because of the Jurisdiction clause in the bills of lading. One of the moving affidavits alleged that the owners' principal place of business was Kristiansand, Norway, explained that the vessel had been time-chartered to Lineas Maritimas De Centro America, S. A., a Costa Rican concern, and set forth the Norwegian identity of the crew and of the three members still in the owners' employ; another, by a Norwegian attorney, stated that Norway had ratified the Brussels Convention and that the provisions of Norwegian law governing Indussa's claims were in all substantial respects identical with the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq., with one exception apparently not material in this case.[1] An opposing affidavit stressed the presence in the United States of a number of witnesses "who can give testimony as to the importation of the shipments and the nature of the damage"; it also argued, on the basis of The Monrosa v. Carbon Black Export, Inc., 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723 (1959), that the Jurisdiction clause of the bills of lading did not apply to an action *in rem*. Overruling the latter contention because of the broader language of the instant jurisdiction clause and applying our ruling in William H. Muller & Co. v. Swedish American Line, supra, 224 F.2d at 808, that the forum may respect such a clause if "the agreement is not unreasonable in the setting of the particular case," Judge Tenney granted the motion on condition that if Indussa brought suit in Norway within 120 days, the owners should waive the statute of limitations and post the same security as in the New York libel. Indussa sought reconsideration on the basis of an affidavit of a Belgian lawyer that a Belgian court would not recognize the Jurisdiction clause, but filed a notice of appeal before the motion was decided. Relying on the lack of docketing of the appeal to authorize consideration of the motion, the judge adhered to his original decision.

Even if we were to adhere to *Muller*, requiring an American consignee claiming damages in the modest sum of $2600 to journey some 4200 miles to a court having a different legal system and employing another language is so harsh a result that we would be strongly disposed to find means for distinguishing the *Muller* decision if such were fairly available. One basis for distinction has

---

1. This was that the package limitation under Norwegian law was 1800 kroner or about $240 as against $500 under 46 U.S.C. § 1304(5).

already been suggested—the difference in the practical effect of requiring resort to a distant forum when the claim is for $2600 as against the $55,000 in that case. Another might lie in the fact that whereas in *Muller* the shipment was not merely on a Swedish vessel, but from a Swedish port and the bill of lading purported to make Swedish law applicable, here the only relationship of Norway was the ownership of the vessel, and the bill of lading appears to make Belgian or, more likely, United States law prevail over Norwegian. Other possible bases would be the failure of the instant bill of lading to identify within its four corners the forum to which litigation was confined, the alleged invalidity of the Jurisdiction clause under Belgian law, and the fact that the Muller Company did not have to call witnesses to establish the amount of its damages since the ship had sunk and the sole issue was her unseaworthiness. We are convinced, however, that *Muller* is inconsistent with the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315 (1964), and should be overruled.

Since § 3(8) of COGSA forbids "Any clause, covenant, or agreement in a contract of carriage * * * lessening [the carrier's liability for negligence, fault, or dereliction of statutory duties] otherwise than as provided in this Act," the district courts in applying *Muller* have been obliged to forecast the result of litigation in a foreign court or attempt other expedients to prevent a lessening of the plaintiff's rights. The difficulties inherent in the former task are illustrated by the differing results in Pakhuismeesteren, S.A. v. S/S Goettingen, 225 F.Supp. 888 (S.D.N.Y.1963), and General Motors Overseas Operation v. S.S. Goettingen, 225 F.Supp. 902 (S.D.N.Y.1964), both relating to shipments on the same voyage. One district judge declined jurisdiction in favor of the German courts on the basis of *Muller*, whereas the other, on a showing that German law would be less favorable to the plaintiff and thus contrary to the Carriage of Goods by Sea Act, refused so to decline. Cf. Chemical Carriers v. L. Smith & Co.'s Internationale Sleepdienst, 154 F.Supp. 886 (S.D.N.Y.1957). In still other cases where the district court had declined jurisdiction, it has addressed an admonition to the foreign court that it expected the Carriage of Goods by Sea Act would be applied. See N. Y. Underwriters Ins. Co. v. M. S. Wurttemberg, 235 F.Supp. 909, 910 (S.D.N.Y.1964). Cf. Murillo Ltda. v. The Bio Bio, 127 F.Supp. 13, 16 (S.D.N.Y.), aff'd mem., 227 F.2d 519 (2 Cir. 1955); Takemura & Co. v. S. S. Tauneshima Maru, 197 F. Supp. 909, 912–913 (S.D.N.Y.1961). Pretrial litigation over the place of trial, always to a certain degree undesirable,[2] becomes especially so when the court is required to make a forecast as to the merits on the basis of conflicting affidavits of experts concerning what a foreign court would decide both as to choice of law and as to substantive law and there can be no real assurance that the prophecy will be validated by the result.

We think that in upholding a clause in a bill of lading making claims for damage to goods shipped to or from the United States triable only in a foreign court, the *Muller* court leaned too heavily on general principles of contract law and gave insufficient effect to the enactments of Congress governing bills of lading for shipments to or from the United States. This is instanced not only by the reliance on Judge L. Hand's concurrence in Krenger v. Pennsylvania R. R., 174 F.2d 556, 561 (2 Cir. 1947),

---

2. In an effort to avoid *Muller* other district courts have resorted to distinctions which, like some of those we have suggested, may be better justified by their result than their intrinsic merit. See Sociedãde Brasileira De Intercambio Comercial E Industrial, Ltda. v. S.S. Punta Del Este, 135 F.Supp. 394 (N.J.1955) (Forman, Ch. J.) [no identity of law and place of suit]; Transcontinental Commodities v. Italnavi Societa Di Navigazione Per Azioni—Genova, 175 F.Supp. 406 (S.D.N.Y.1959) (Weinfeld, J.) [applicability of jurisdictional clause to particular suit disputed].

compare Wood & Selick v. Compagnie Generale Transatlantique, 43 F.2d 941, 942 (2 Cir. 1930), but even more so by the court's statement that it was following Cerro De Pasco Copper Corp. v. Knut Knutsen, 187 F.2d 990 (2 Cir. 1951), which involved a shipment from Peru to Belgium not subject to the United States COGSA. Examination of the *Muller* briefs shows that counsel had not called the court's attention to Knott v. Botany Mills, 179 U.S. 69, 21 S.Ct. 30, 45 L.Ed. 90 (1900), arising under the Harter Act, where the Supreme Court, dealing with a shipment to the United States, declined to give effect to a clause making the law of the flag applicable. The Carriage of Goods by Sea Act begins by stating that "Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this Act," and § 13 repeats that "This Act shall apply to all contracts for carriage of goods by sea to or from ports of the United States in foreign trade." Such language would seem to forbid an American court from a holding that might cause a bill of lading covering an ocean shipment to or from the United States to be subjected to foreign rather than American law in litigation.[3] Although these provisions of COGSA, like the *Knott* decision, do not speak directly to a clause which simply vests a foreign court with exclusive jurisdiction, giving effect to such a clause is almost as objectionable as enforcing a clause sub-jecting the bill of lading to foreign law since, despite hortatory efforts, there would seem to be no way, save perhaps stipulation by the parties, that would bind the foreign court in its choice of applicable law. See Gilmore & Black, Admiralty § 3–25, at 125, n. 23 (1957); Note: Ocean Bills of Lading and Some Problems of Conflict of Laws, 58 Colum. L.Rev. 212, 220 (1958).

Moreover, § 3(8) of COGSA says that "any clause, covenant, or agreement in a contract of carriage * * * lessening [the carrier's liability for negligence, fault, or dereliction of statutory duties] otherwise than as provided in this Act, shall be null and void and of no effect." From a practical standpoint, to require an American plaintiff to assert his claim only in a distant court lessens the liability of the carrier quite substantially, particularly when the claim is small. Such a clause puts "a high hurdle" in the way of enforcing liability, Gilmore & Black, supra, 125 n. 23, and thus is an effective means for carriers to secure settlements lower than if cargo could sue in a convenient forum. See Note, Enforcement and Effect of the Jurisdiction Clause in Admiralty, 34 St. Johns L. Rev. 72, 78 (1959). A clause making a claim triable only in a foreign court would almost certainly lessen liability if the law which the court would apply was neither the Carriage of Goods by Sea Act nor the Hague Rules. Even when the foreign court would apply one or the other of these regimes, requiring trial abroad *might* lessen the carrier's liability since there could be no

---

**3.** While a proviso to § 13 of the Carriage of Goods by Sea Act requires a recitation of its paramountcy only in respect of bills of lading on shipments *from* the United States, we do not read this as detracting from the generality of the two clauses just quoted. The proviso seems to have been aimed at carriers who would seek to evade the United States Carriage of Goods by Sea Act by refraining from mentioning it and including contrary provisions in their bills of lading and then arguing "in the courts of the port of destination and in other countries that the bill of lading should be given effect ac-cording to its expressed provisions. There are a number of countries in the world which will accept this argument and apply the written bill of lading as the contract of the parties, regardless of the COGSA in force at the port of loading." Knauth, Ocean Bills of Lading, 161 (4th ed. 1953); see also Selvig, "The Paramount Clause," 10 Am.J. of Comp. Law 205, 207–08 (1961). Moreover, Congress may have hesitated to direct what action was to be taken in a foreign country possibly entailing drastic consequences for omission. See Gilmore & Black, Admiralty § 3–44 (1957).

assurance that it would apply them in the same way as would an American tribunal subject to the uniform control of the Supreme Court, and § 3(8) can well be read as covering a potential and not simply a demonstrable lessening of liability. See Note, supra, 58 Colum.L. Rev. 220; Note, supra, 34 St. Johns L. Rev. 79–80. We think that Congress meant to invalidate any contractual provision in a bill of lading for a shipment to or from the United States that would prevent cargo able to obtain jurisdiction over a carrier in an American court from having that court entertain the suit and apply the substantive rules Congress had prescribed.[4] In so deciding we do not "outlaw any other tribunal than our own" as our brother MOORE suggests; we hold merely that Congress outlawed clauses prohibiting American courts from deciding causes otherwise properly before them. We need not here determine whether and, if so, under what circumstances the doctrine of *forum non conveniens* could apply to an action on a bill of lading subject to COGSA since The Ranborg clearly did not meet the heavy burden that principle imposes.

■ The Supreme Court granted certiorari in The Monrosa v. Carbon Black Export, Inc., 358 U.S. 809, 79 S.Ct. 43, 3 L.Ed.2d 54 (1958), to resolve what was thought to be a conflict between our ruling in *Muller* and the Fifth Circuit's decision in that case, 254 F.2d 297 (5 Cir. 1958). The Court ultimately dismissed the writ as improvidently granted, 359 U.S. 180, 79 S.Ct. 710, 3 L.Ed.2d 723 (1959), a majority being of the view that the jurisdiction clause in The Mon-

*rosa* was not broad enough to cover so much of the libel as constituted a suit *in rem*. Mr. Justice Harlan, writing for four members of the Court, dissented on the ground that a conflict was fairly presented at least as to so much of the libel as sought relief *in personam*, and should be settled rather than making it necessary "to mortgage our future and constantly mounting calendars with a question which we could and should decide today." 359 U.S. at 186, 79 S.Ct. at 714. A district court in the Fifth Circuit in Insurance Co. of North America v. N.V. Stoomvaart-Maatschappij, 201 F.Supp. 76 (E.D.La.1961), has applied the ruling in *The Monrosa* so as to refuse to give effect to a jurisdiction clause not differing substantially from the one here in issue to a libel seeking relief both *in personam* and *in rem*. While we could await the seemingly inevitable conflict with the Fifth Circuit, we think it preferable to relieve cargo asserting claims in this Circuit under the Carriage of Goods by Sea Act and also our district judges from the burden of *Muller*, without further delay or imposition upon a busy Supreme Court. Compare Swift & Co. v. Wickham, 382 U.S. 111, 115–116, 86 S.Ct. 258, 15 L.Ed. 2d 194 (1965).

The order declining jurisdiction is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

MOORE, Circuit Judge (concurring in the result):

If this Court with its present complement of nine Judges is to review *en banc* decisions of various panels in cases de-

---

4. Our ruling does not touch the question of arbitration clauses in bills of lading which require this to be held abroad. The validity of such a clause in a charter party, or in a bill of lading effectively incorporating such a clause in a charter party, has been frequently sustained. See Lowry & Co. v. S.S. Le Moyne D'Iberville, 253 F.Supp. 396 (S.D.N.Y.1966), appeal dismissed for want of jurisdiction, 372 F.2d 123 (2 Cir. 1967), slip opinions 1103, and cases cited. Although the Federal Arbitration Act adopted in 1925,

43 Stat. 883, validated a written arbitration provision "in any maritime transaction", § 2, and defined that phrase to include "bills of lading of water carriers," § 1, COGSA, enacted in 1936, 49 Stat. 1207, made no reference to that form of procedure. If there be any inconsistency between the two acts, presumably the Arbitration Act would prevail by virtue of its reenactment as positive law in 1947, 61 Stat. 669. See Knauth, Ocean Bills of Lading, supra, at 238–239.

cided over the last fifteen years to determine, according to our present views, whether they have been rightly or wrongly decided, we have indeed set for ourselves a monumental task. My concept of the judicial function is that the particular panel is charged with the duty of deciding a specific controversy between two specific litigants based upon the specific facts therein presented and upon the law applicable thereto. Using this approach, I find no necessity to proclaim the superiority of American courts, American law and the ample adequacy of American awards. Nor would I speculate on Congressional intent—always a rather uncertain, at best, venture.

The controversy here involves the damage of goods—only $2,600 to be sure, but amount should scarcely be a determining factor. The bill of lading provided for the application of the Carriage of Goods by Sea Act, the shipment having been in "U. S. Trade." The bill itself contained no clear contractual agreement providing for exclusive jurisdiction in Norwegian courts. Furthermore, the action here was solely against the ship *in rem*. Even if discretion as to jurisdiction were involved, there are more than adequate reasons for retention here.

In my opinion, to use this present case as a vehicle for overruling and characterizing as "wrongly decided" a case—William H. Muller & Co. v. Swedish American Line, Ltd., 224 F.2d 806, (2 Cir., 1955), cert. denied, 350 U.S. 903, 76 S.Ct. 182, 100 L.Ed. 793 (1955)—based on a radically different factual situation, is quite unfair to the *Muller* court and unnecessary to our decision. If there is to be speculation, I would speculate that the *Muller* panel might well have reached the same result as we reach here.

Moreover, if Congress had really intended to outlaw every agreement in a bill of lading as to choice of forum for litigation, understandingly and voluntarily entered into, it could, and undoubtedly would, have easily drafted such a clause. The forbidding of a clause "lessening" liability in COGSA is scarcely the equivalent of a rejection of the rights of the parties to agree upon a forum. I find it singularly inappropriate for our courts to say, in effect, that the courts of all other nations are so unable to dispense justice that, as a matter of public policy, we must protect our citizens by outlawing any other tribunal than our own.